This morning is Jester v. Hutt. Jester v. Hutt Good morning, your honors. May I please the court, Gordon Einhorn for appellants Fantasy Lane Stables and Robert Hutt. I would like to reserve four minutes of my time for rebuttal, if I may. Granted. Thank you. There are three issues which we have on appeal. The first is whether or not the trial court erred in granting partial summary judgment and dismissing the negligence claims, which negligence counterclaims, which had been brought by Fantasy Lane Stables, and whether the court erred because there was a genuine issue of material fact, which should have precluded the court from granting summary judgment. The negligence claims involved injury to the horses, which were being boarded by Fantasy Lane Stables at Penridge Farms near Harrisburg. The horses were there for a number of years. And while they were there, a number of horses were injured and a number of horses died while in the care of Penridge. And hence the negligence claims were brought. During the course of discovery in the matter, it came to light that there was in fact a release that had been entered into by Fantasy Lane Stable by its president, Robert Hutt. This release was between Fantasy Lane and a non-party to this action, a veterinarian. It's a general release though, right? It is a general release, correct. And your argument is that it was sort of fraudulently obtained or fraud in the inducement? Yes, Your Honor, that is exactly our argument. But this isn't a matter of a draft release being submitted and then a couple words being changed here or there or some sort of sneaky drafting. I mean, this was a one-page release that turned into a three-page release. But any responsible lawyer would read every word of the three-page release and quickly appreciate that the three-page release is different than the one-page release. But in this case, Your Honor, the second version of the release, which was longer, was not reviewed by an attorney at all. All right, and what about the party? Wouldn't any rational party take a look at the three-page release and immediately recognize, assuming they understand English, that it's different than the one-page release? Well, and Mr. Hutt did get it back and give it a review. But bear in mind, Your Honors, that the release was also accompanied by a cover letter when he sent his version of the release to the veterinarian, Dr. Edelson. And Dr. Edelson returned it to Mr. Hutt with a cover letter that said that the release had been revised to include language necessary for such a document in the Commonwealth of Pennsylvania. All right, so you read the three pages, and if there's anything confusing in it, then you ask your lawyer to look at it. Mr. Hutt, in reading the cover letter, took it to mean that the changes that had been made to the release were merely technical changes. So why would any reasonable juror agree with that? Why would any reasonable juror think that a one-page release turning into a three-page release would be merely technical changes? I think there's a good reason for that. I mean, the cover letter indicated that, in so many words, that only technical changes had been made to the release. And if you look at the release and the way it was expanded when it was sent back to Mr. Hutt, it was basically boilerplate. It was two to three pages of boilerplate language. And so that was consistent with what was in the cover letter that said only technical changes were made. Reviewing that cover letter and then looking at the release, that the release seems to be consistent with that. What was added in the additional language that had been added was legalese, which to a layman like Mr. Hutt, he reviewed it. He gave it a quick review, relying on the cover letter, indicating that it was just technical language that had been added. He believed that to be true. And we think a reasonable juror could look at that, look at the boilerplate language in the revised release, look at the cover letter, which said technical language had been added. And a reasonable juror could believe, well, in that position, I think I would do the same thing. Would I, as a layman, really go through and read it word for word? I'll rely on the cover letter, which told me that it was only technical language that had been added. Seaton, from the Pennsylvania Superior Court, seems to go directly contrary to the argument you just made. I'm not familiar with the language. What language was this? Seaton versus East Windsor. The court said that an appellant who signed a release he did not read cannot, absent fraud or relation of trust and confidence between the parties, avoid the effect of the release. Upon the ground that at the time he signed it, he did not read it or know its contents, but relied on what another said about it. But the key language there, Your Honor, was in the absence of fraud. Wouldn't fraud be, here's a release. I haven't changed it. I've signed it. Now you countersign it. Or even saying maybe nothing. But when the lawyer says, I've made some changes, wouldn't that be enough to put anyone on notice? If that's all the cover letter had said, I made some changes. But again, specifically what the cover letter said was, I showed it to my lawyer. The lawyer added some language that he said were necessary to make the document, the release, comply with Pennsylvania law. When you get a letter from your adversary's lawyer saying I've made changes, no matter how he characterizes them, that shouldn't be enough to maybe invite you to forward that letter to your own lawyer or at least read it yourself? Well, again, Mr. Hutt was a layman. It had been represented to him. The technical language had been added. He looked at it. And what he saw was consistent with what he had been told, that the technical language had been added. And he relied on that. How is that about the fraud or inducing someone to sign something that they shouldn't have known was of some significance? Well, the the the the inducement was a Mr. Mr. Hutt wanted to sign the agreement. Mr. Hutt initially drafted the agreement himself. The again, the cover letter induced him to to to sign the letter without taking it to his attorney. He relied reasonably, we believe, on the representation made by Dr. Edelson that only technical language had been added. Well, yeah, but you're undermining every release that's that's signed then because according to established laws, you sign a release and unless it's been fraudulently and someone has brought something to your attention, which is a fraud and you sign, you didn't know what it was, you're stuck by that release. Otherwise, you're going to do away with just about every litigation that that goes forward where there are releases signed. You've got to show something very significant. Tied them out to fraud. And you don't have that in this case, do you? Well, I think we do, your honor. Again, the going back, if you look at. Did you argue fraud? Was it in the. Yes, your honor. It was in the jury instructions that. Well, actually, this was on summary. Oh, that's right. And we argued that to the district court. And we frankly think that. I mean, she held the trial court judge held that no reasonable juror could have found that Mr. Hunt reasonably relied on the on the representations. And what's the best case that you have to counter that? Well, I mean, in this this court's own case, Hunt versus U.S. Tobacco Company, and the court said that invalidating a release can be invalidated based on a claim of fraud. If you can show that there is misrepresentation of material fact center intention about the declarant to induce action, justifiable reliance by the party defrauded upon the misrepresentation and damage to the party, defrauded as a proximate result. We believe that all of those elements. That's just a legal standard. You just you just cited a case explaining the legal standard. I'm asking you what's what's the best case that you have with facts that are somewhat akin to the facts that we have here, where the case held that there was justifiable reliance. Your Honor, other than the Hunt case, I don't have any other cases to cite to the court. All right. Well, that what that suggests is this would be if we accepted your argument that the district court erred in saying no justifiable reliance. This would be a factual outlier then. Right. Well, not really, Your Honor. I think it's the I think it's fairly clear that if you look at the criteria put forth in the Hunt case, that all five of those criteria are present here. The judge at the trial court in handling the summary judgment motion focused on one issue, whether or not there was justifiable reliance. She said no jury could no juror could find that this reliance was justifiable. However, there are other facts in the record that are sufficient to raise a genuine issue of fact. The supplemental declaration that was submitted by Mr. Hunt in opposition to the summary judgment motion stated that he had never in his life prepared an agreement that that although he the trial court judge relied heavily on the fact that he had worked for CNA insurance as a national claims manager for about 12 years. And she said based upon that, he was sophisticated and he knew what he was doing. We had, however, submitted Mr. Hunt's supplemental declaration in which he said that although he had worked for an insurance company, he had never himself prepared an agreement. He always relied on outside counsel. When he got those releases back from outside counsel, he did not review them because he relied on them. That he had no expertise whatsoever in drafting releases and that, in fact, he had been out of the insurance business for more than 34 years. All of those facts raised in his supplemental declaration were sufficient to raise a genuine issue of fact on the important issue to the court, which was, did he justifiably rely? We believe that there was a genuine issue of fact and the court erred in saying that there was not such an issue and in granting summary judgment. Thank you, Mr. Einhorn. We'll hear you on rebuttal. Mr. Bradshaw. Good morning, Your Honor. Please, the court. My name is Mark Bradshaw and I'm a lawyer from the Stevens and Lee firm in Harrisburg. We were the verdict winner below. I want to touch only briefly on the issues that Mr. Einhorn was discussing with you before I get to the punitive damages reduction, which I think is at the heart of the case. With regard to the release, what Judge Cain did was to review Mr. Hutt's deposition testimony, wherein Mr. Hutt spent at least a dozen pages, if not more, bragging about the level of his experience in the insurance industry, bragging about the number of lawyers that he had supervised, thousands, the number of cases he had resolved, hundreds, bragging that he had only resolved the largest cases in the company. And when I asked him if he always procured a release when he resolved the case, he said, of course. And I said, humor me. Why would you do that? He said, well, because once you sign a release, once the other party signs a release, you don't want to hear about the claim anymore. And then I showed him the release that he had signed. Now, Judge Cain found, and this is, it's almost like a law school exam, although, frankly, it might even be more like a sitcom, this individual claiming that he did not have to read a release, when he had spent 12 years in the insurance industry, resolving large dollar claims, utilizing releases for this individual to come into court and say, but I didn't read it, and there's no good reason that I should have read it, and I was misled by the veterinarian's cover letter, which clearly called out that my lawyer has made changes to the release, which took it again from one page to three pages. For that individual to say, I didn't read it, does not raise a genuine issue of material fact sufficient to go to trial. All right, before you get to the punitives issue, let's look at the compensatory damages issue, because one of the curious things about this case is, as I read the record below, you asked for the boarding fees that were unpaid. I think it was about $65,000, and the jury gave you not only that, but it gave you another $45,000 that you hadn't asked for. Well, they awarded the board fees. You're exactly right, and they awarded more than the invoices that had been tendered to Mr. Hutt and Fantasy Lane Revealed. What happened was the parties got into a dust-up in September of 2014. This is the infamous phone call that led to the flurry of emails that we'll discuss in a minute. What happened was the two parties passed like ships in the night on that phone call. Mr. Jester was saying, you are in serious arrears, and I need you to bring your account current. Mr. Hutt was saying, you got to be kidding me. You want to talk about the outstanding board bill? You killed my horse, and it went downhill from there. So the award was more than the invoices. Was it more than you asked for? Well, there was not a specific prayer for a specific amount. The invoices were tendered. It's plaintiff's Exhibit 23B, because it was Exhibit B to the state court complaint before this was removed. It's in the record at 725 through 745. And what the jury, I think rather obviously, did was look at the invoices, which were in range between $9,000 and $11,000 per month, realized that the invoicing only went through the end of July. There was absolutely no question that the horses didn't move until Christmas Eve, 2014. And they looked at that and said, well, there are four or five unbilled months there at roughly $10,000 per month. So you take the $65,700 and change that the invoices as of the end of July represented, and you add the unbilled months, because the jury effectively- It sounds like an extended way to answer Judge Porter's question by saying, no, we didn't ask for it. That's fair. But you're saying the record supports it nonetheless. So that saves you. Let me recast that. It's not just me that's saying that. Judge Cain said that. The jury awarded it, and Judge Cain looked at it in the face of this particular allegation. And it was a contract claim, right? Yes. And she said the evidence more than supports what the jury did. And under standard of review, that was a discretionary call for her in response to a request for a new trial. She said, no new trial. I can follow what happened here, and it's reasonable. And that's supported by the evidence. The evidence was before the jury as to the extended care. Exactly. There was no dispute. And was there any objection to it? No. All right, but if that verdict hadn't been $110,000, if it had been $150,000, you'd have a problem, right? Because you're relying pretty heavily, as I understand it, Mr. Bradshaw, on the concordance between the monthly boarding fee and the number of months beyond the invoice period that the horse has remained at your client's. That is the evidence that was before the jury, and that is what the district court found sufficient to uphold the verdict that the jury entered. But in summation, did you ask for the entire amount, including that which had not been billed up to that point? Not specifically. In the closing argument, what I did was to say that we had been stiffed for the board bills, and we were asking that the board bills be awarded. I did not specifically use, for example, a demonstrative exhibit and say, now, bear in mind, this only goes through the end of July, and there were another four months. So, candidly— Was there any discussion of the additional four months? There was not. But the evidence was before the jury— Yes. —that the additional months were there. Absolutely, and there was absolutely no question that the horses remain, and they're horses. They have to be fed. That was the whole point of our breach of contract claim, was that we hadn't been paid for food and care for the horses. Was there any objection to anyone from your adversary that the additional time should not have been before the jury? No. All right, what about punitives? Your Honor, forgive me, I recognize that this is indelicate. I just realized I didn't ask for a rebuttal, and I would like to reserve a few minutes. Well, we don't give it to Appellee. You have a cross appeal, but I'm not sure we'll need it, but we'll see. Very well. Let me turn, if I may, to the— You've got eight minutes on punitives, so let's go there. Whether a jury's punitive damages award is unconstitutionally excessive is a question of law, over which this court has de novo review. So I want to start there. The trial court rather obviously reduced what was close to a $90,000 award, $89,999 plus the $1 in nominals, which I'll come back to in a moment, to $5,500. Now, for context, again, the breach of contract award was $110,000. So that's what the parties started arguing about. And if you view the punitive award, $89,999, in light of the contract award, $110,000, that's less than a one-to-one ratio, and the Gore-Campbell analysis that the district court engaged in is entirely unnecessary. Yeah, but as I read the punitive damage cases, you cannot relate the punitive damage to a compensatory crime, which has been already remunerated for. You're rewarding this for his outrageous remarks. I understand that viewpoint. To your client, to your employees, and to your future clients, which was $1. Precisely. And he walked away with a $90,000 proportional award. Let me turn to the crux of the argument there. The word that appears nowhere in the district court's opinion is nominal. Nowhere in the opinion at all. And in fact, to the contrary, what the district court said, which was inaccurate and fundamentally flawed, and I think is where the case turned left on the punitive damages point, is she said here, quote, from page 12 of the post-trial opinions, it's at A3536, quote, here the jury awarded punitive damages in an amount approximately $90,000 times the compensatory damage award of $1. But the verdict slips say. What it said was, do you find damages, compensatory damages? And if not, first it said, do you find defamation? They said yes. Then it said, if you find damages, enter the amount here. And if you do not award compensatory damages, you must award $1 in nominal damages. And they entered $1. So it's plainly a nominal award. They put it in the nominal damages blank? No. No, what the instructions said. Did plaintiffs prove by a preponderance of the evidence that Defendant Robert Hudd published a defamatory statement of and concerning the plaintiffs? Yes. Next question. Please state the amount of damages, if any, for which you defined the defendant liable for defamation. Compensatory damages, $1. If you find that plaintiffs are not entitled to any compensatory damages, you must award plaintiffs $1 in nominal damages. And what they put on the line was $1. It was nominal. That was what was invited in the closing argument. What we frankly said was, we are not even attempting to make a specific request for compensatory damages as to the defamation. Mr. Jester said, this destroyed my farm. And that's at page 560 in the record. But he did not attempt to say, in the year before I earned this, and in the year after I earned that, and the delta is all correlated to the defamation. But the verdict slips internally contradictory, then. I don't think so. Well, they gave your client $1 in compensatory and $1 in nominal damage. No. You just read that under compensatory, they put $1. Well, in the line underneath that, it says if you do not award compensatory damages, you must award $1 in nominals. There was only $1 for a dollar amount? Exactly. Well, the $1 was compensatory for the defamation. It was nominal for the defamation. Not nominal for the defamation. It had nothing to do with the compensatory for the room and board of the horses. Correct. So that you have a situation where there was horrendous conduct here, defamation, which resulted in no damage. He was unable to prove that he lost any business by reason of this bad-mouthing. But he definitely tried. And therefore, there's a $1 nominal damage. And then from there, we go to the putatives. And you're entitled to some putatives. Exactly. But are you entitled to, under Supreme Court, Mercedes-Benz law, or NSU law, whatever it is, $90,000? In other words, what is wrong with the district court saying, well, maybe not $90,000, but 90,000 times, but perhaps $5,000? Here's what's wrong with that. This is defamation per se. And unlike BMW versus Gore, unlike State Farm versus Campbell, et cetera, we're not talking about big businesses. We're talking about basically a verbal fistfight between two small businessmen. This was not some amorphous, omnidirectional corporate conduct that had bad outcomes to various different people. This was targeted, it was directed, and it was an attempt to destroy someone's business that succeeded. What's the case law say about the range of punitive damages that are allowable in nominal damage cases? Thank you. That's exactly the thrust of our presentation. This court, as far as we can find, has not answered that question. How about other courts? There's got to be a range. The Second Circuit, the Fourth, the Fifth, the Sixth, the Seventh, and the Eleventh have all said that if you are reviewing a situation like this where you have nominal damages using a multiplier, a la BMW versus Gore or Campbell, is inappropriate and is unhelpful. And if you read the district court's opinion, there is absolutely no question... What is the range of allowable damages? Well, then you go back, I think, to the ordinary case law, which the trial court dealt with in some detail at page 7 of its post-trial opinion, 830. And what it says is that this court will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice, large verdicts are not necessarily excessive verdicts. The reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant as a result of partiality, prejudice, mistake, or corruption. She made no finding that there was partiality, prejudice, mistake, or corruption. This is a large verdict. That does not make it an excessive verdict. But if the damages award were compensatory and not nominal, then under BMW v. Gore, it would have to be remitted to $10 in punitives, right? The 10 to 1 ratio. Right. And that's why all the other circuits that have looked at this have said you can't use a ratio under those circumstances. It just doesn't apply. Right. There's a sharp dichotomy in your view between compensatory damages and punitives that relate to the compensation award, on the one hand, and nominal damages and the punitive damages that are attendant to the nominal award. Absolutely.  Absolutely. And what the district court did, and it is crystal clear in the opinion, is she applied BMW v. Gore. She said this is a 90,000 to 1 ratio case that can't possibly pass constitutional measures. But she put in a 5,000 to 1 case. A ratio. That's patently wrong under BMW, right? I noted in my brief that it's a curious position for me to take, but her own number would not pass scrutiny under that standard. 5,500 to 1. It would have to be $10. That's why nominals have to be treated differently. And so what the central Pennsylvania jury did here was to look at what had happened and to say, in light of Mr. Hutz's willingness to engage in this kind of defamation, to slide out from under a $110,000 board bill that he didn't want to pay, we're going to make him pay it twice. $110,000 plus $90,000. Round number, $200,000. That's what they did. It's obvious that that's what they did. Well, you always have, like, it's not a criminal case. In that situation here, does the punishment fit the crime, so to speak? And sure, you want to punish them for this conduct, but there are cases saying there was no tortious conduct here. No one was physically injured. The damage to your client was strictly economic. It wasn't physical damage that was done to your client as such. And therefore, if you come from a trial background, you say, look, the district court that was there, he saw the whole thing, and why should we just be guided by the district court's analysis unless it's really off the wall and you have to award something? And perhaps I would have awarded more or less, but what's wrong with just saying that the district court made an analysis here and it's not totally unreasonable? Several quick points on that. First of all, in the Exxon Valdez case, which was unfortunately not cited in our brief, but I do have a citation here, that one of the factors bearing on reprehensibility is the economic motivation of the defendant. And that was overlooked here. The fact that Mr. Hutt was attempting to get out of paying a board bill, and that makes it reprehensible. What the case law, what Exxon says, which is a United States Supreme Court case, is that if someone is acting to further their own economic interests, that makes it particularly reprehensible. What the case law says is that if you're going to remit a case for constitutional reasons, you still have to slot the award at the highest possible level. There's no discussion of that here. There's no discussion, there's no show your work. What she says is, if $90,000 to one is totally outrageous, I'll go with $5,500. There's no explanation for where that came from. And if punitive damages are to send a message, and to be a penalty, and to deter, $5,500 under these circumstances doesn't come close. It's a slap on the wrist. I'm sure Mr. Hutt was celebrating when that post-trial motion came out. Well, what would your argument be if instead of $90,000 or close to it, the award had been $150,000 punitive? What I'm saying is that in the context of this case, an $89,000 punitive award should not have even attracted anyone's attention. And I think that it probably wouldn't have if we hadn't gone down the Gore rabbit hole and said it's $90,000 to one. Well, let's tease that out a minute. What if it was $1 million? I'd have a problem. I'd have a problem. Where would you stop having a problem? Why would you have a problem at $1 million? I thought you'd be even happier than you are now. No, because it would be harder to defend. Well, draw the number where the problem would start. In all seriousness, why would $1 million be a problem if we have a system that entrusts to juries the sense of outrage of the community as to just how bad somebody's behavior is? Because then you'd be beyond five to one, even as opposed to the contract award. But I thought you were telling us that the ratio of the BMW v. Gore analysis is irrelevant in the context of a nominal damages award. That's my position. But I think that if you get into $1 million or thereabouts, you're still going to as the case law says, raise the judicial eyebrow. My point here is... So it's a field test? Apparently to the district court it was. Yeah, but I understand you to be arguing that was error. Well, what I'm saying is that the jury was entitled to make that call, and before the district court is going to nullify the jury's verdict, there has to be a sound constitutional basis to do it. And her basis was unsound because she was using a ratio test that is not applicable because they were nominal damages. All right, but back to Judge Porter's question, why would $1 million be a problem? Why would the ratio analysis spring up and be properly applied to his hypothetical but yet be inapplicable to your $90,000 award? From a consistency standpoint, you're right. My only point is that I think $1 million would get everyone's attention and say, wait a minute, really? For a couple nasty emails, $1 million? But in this context... So when you say you have a problem, it's not you have a legal problem, you're going to have a tougher time defending the legitimacy of the email? Not an optical problem. But here, if you look at the dispute the way it was presented to the jury, Hutt was trying to get away from paying his board bill. The board bill was $110,000. They rounded the verdict, consequently driving a punitive award that was slightly less than the contract award, and I do understand the distinction between a sum sit and tort and the fact that that was contract and this is defamation and so on, but if you look at it the way the jurors were looking at it... Are they allowed to look at it? They're looking at the punitives are only looked at concerning the defamation? Correct. And they should not be looked at concerning the failure to pay the board bill. So that you have a... Well, going with Judge Porter's analysis, a million would bother you. Take it down to $500,000. Where does it start? What number? $400,000? $500,000? $300,000? You're up to $90,000 already here. Doesn't bother you, but how about $110,000? $200,000? $300,000? A million bothers you, but where do you draw the line? At that point, I think you're into the analysis that the court set forth in the earlier part of its decision talking about the contract claim, which is, is it grossly excessive? Does it shock the judicial consciousness of the product of pride and prejudice and so on? She never made any of those findings here. She just said it's too much. And I think it's for the jury to determine what the appropriate award is unless there's a constitutional infirmity the jury award should stand and in this case it should be reinstated. The only constitutional infirmity that was called out was a ratio that is inapplicable under the laws of every other circuit decision that has ever come down on this topic. Thank you. Thank you, Mr. Bradshaw. We'll hear Mr. Einhorn's rebuttal. Before I get to the punitive damages, just a couple of comments on some of the other issues in response to Mr. Bradshaw. In terms of Mr. Hutt's experience and background as an insurance person, Mr. Bradshaw pointed out that in his deposition Mr. Hutt bragged this, bragged that, bragged about how much experience he had, bragged about how many lawyers that he had supervised. The key word there is bragged. At his deposition there is no doubt that while Mr. Hutt answered questions about his CV, he was also engaging in some puffery and I think perhaps trying to impress Mr. Bradshaw with his background. The point of fact is if you look at his background and if you look at his declarations, both declarations in opposition to the summary judgment motion, Mr. Hutt makes clear that in fact his legal expertise notwithstanding his insurance employment was very limited and that there is an issue of fact as to whether or not his behavior was reasonable. With regard to the jury's award of the additional months above the $65,000 in board bills, the record is clear that there was never any evidence presented to the jury that more than $65,000 were owed. Those were the only demands for payment prior to litigation that were ever made. The horses were kept there an extra four months involuntarily because of the overdue board bills Penridge would not allow the horses to be removed, so they were there involuntarily. All of that was before the jury. The jury was unmoved by the fact that the horses were removed. The jury blamed your client for that, hence the award. But the bottom line is that the jury acted on pure conjecture. There was no evidence. The numbers match up pretty cleanly, though. It doesn't seem conjectural. It seems easily explained. Well, it's clear how they computed it. But the issue is were they right to go beyond what was requested and... Do you have any cases to support that? I think you've highlighted the key issue, which is if the analysis is that a lawyer has to ask for compensation in order to get it, you win on that. If the evidence in the record needs to support the award, you lose on that. So what cases do you have for the former proposition? We have one case which a Pennsylvania Superior Court case, which we have in our brief, in which there was a construction case. Plaintiff did not ask for overhead and profit. There was evidence before the jury that overhead and profit was certainly an issue that was out there. But it was not specifically requested. The jury... Well, I think I know what you're talking about. In that case, unlike the case we have here, the evidence was before the jury and it was not objected to. It was completely unobjected to. And the evidence was before the jury. Well, here, the evidence was before the jury only to the extent that there was no dispute that the horses were, in fact, there the additional four months. Yeah, but the point is, the evidence was there. It's undisputed. And their claim is that they were there. They weren't being held hostage. You just didn't pay the bill. So the fact that the plaintiff didn't affirmatively ask for the additional amount, but it wasn't objected to, and the evidence supports the jury's verdict. I'd like to go on to the punitive damage case here. What do you have to say about Willow Creek, which, pretty much as I read that, says that we should not substitute our judgment for that of the district court's judgment concerning two of the damage awards? Well, I would agree. I think that the court, the district court made a very Well, I mean, the district court is the jury's interpretation. Yeah, we should not substitute our, or the district court should not substitute its judgment for what the jury has determined was the horrendous conduct that your client engaged in here, even though there was no proof of actual damage from that, but was compensable under the punitive damage award. Your Honor, I would say that the Gore Campbell is the proper analysis here. And the judge applied it correctly. Where has Gore Campbell been applied to a nominal damages award? Well, but it has been applied in cases of compensatory damages where they only award three dollars in compensatory damages. But this is a nominal award, isn't it? It is not. Well, that's a little unclear. I mean, again, as was discussed previously. One dollar screams nominal pretty loudly. In fact, that's the exact number. If it were five dollars, it would be compensatory. If it were two dollars, right, because the verdict slip specifically said you must enter one dollar if you find no compensatory. It did. And it was entered on the line that said compensatory damages. Well, but there was no separate line for nominal. That is correct. But my argument would be that why is the Gore Campbell analysis, if it's correct in a case when there is three dollars in compensatory damages, it's also correct in a case where there's one dollar in nominal damages. There's no reason why the analysis should not be the same. Counsel, Mr. Bratcher, was also incorrect in saying that Judge Cain did no analysis. She just was, she didn't like, she didn't think the result was proper and she reduced it. That's not exactly true. She said the Gore Campbell analysis applies here. And she also went through the analysis very carefully. But that's because she said it was compensatory. If it were in fact a compensatory award then Gore Campbell would apply. That's correct. But I think it also applies here in a case of one dollar in nominal damages. There's no reason why the rationale would be the same. It wouldn't be the same. So your argument is how much should the court, how much should we rule on the this award? How much should it be? I think Judge Cain decided correctly in the post-trial motion. You think a 5,000 to 1 ratio is correct under Gore Campbell? Yes, Your Honor. I think it is defensible under Gore v. Campbell. I thought you'd be entitled to $10 or less. That's what Gore Campbell requires. A single digit ratio, doesn't it? Not necessarily. Campbell said that few awards exceed a single digit ratio. But Gore said a higher ratio may be appropriate in cases of very low or no economic damage. So even Gore v. Campbell carved out an exception for when damages, compensatory damages, are extremely low or non-existent. And I think this case is exactly that. That the nominal damages here are equivalent to $3 in compensatory damages. And Gore said that in certain cases when they are very low or non-existent the ratio may be exceeded. So it's our argument that Gore v. Campbell, the Gore-Campbell analysis is correct and that the district judge properly applied it in this case. I was looking through the record to see the Appalachian counterclaim and I didn't find it. If it's not in there, could you supplement the record so we can see exactly what you asked for on your counterclaims? What damages you asked for? To Mr. Bratcher? Yeah. I didn't see your... So that I understand the court's inquiry... Well, you're going to have to come to the podium. Any other questions for Mr. Einhorn? No. Okay. Thank you, Mr. Einhorn. Mr. Bratcher, would you approach and answer Judge Porter's question? Yes, I'd certainly be more than happy to supplement the record. I want to be clear on what it is that you're asking for. You asserted counterclaims, right? No, I was the plaintiff. I'm confused. This was a breach of contract case in state court. I just want to see your complaint then so that we can see the damages that you asked for. If you'll give me a moment, I'm reasonably sure it's in the record. Okay. Page 711, sir. Okay. What was the prayer for relief? Hmm. As a result of the nonpayment of the contemplated services, one or more of the defendants is in breach of the agreement and one or more of the plaintiffs has been damaged. Wherefore, plaintiffs demand judgment in their favor and against defendants in an amount to be proven at trial, but which exceeds applicable arbitration limits together with such other and further relief as the court deems just. That's page 717 of the reproduced record. All right. Thank you, Mr. Einhorn. Thank you, Mr. Bradshaw, for the helpful argument.